

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-19-00071-CV
No. 07-19-00072-CV

**IN THE INTEREST OF D.T. AND A.T., CHILDREN**
**IN THE INTEREST OF J.C., A CHILD**

On Appeal from the County Court at Law No. 1
Randall County, Texas
Trial Court No. 72,269-L1 and 72,268-L1, Honorable Jack M. Graham, Presiding

July 16, 2019

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PARKER, JJ.

These two appeals arise from final orders in two termination-of-parental-rights cases. Petitioner in the trial court and appellee in both cases is the Texas Department of Family and Protective Services. In case number 07-19-00071-CV, the mother and the father each appeal the termination of their parental rights to D.T. (age six at the time of final order) and A.T. (then age three). In case number 07-19-00072-CV, the mother appeals the termination of her parental rights to J.C. (then age eight). J.R.C. is the

biological father of J.C. and was a party in the trial court in case number 07-19-00072-CV but did not appeal the order terminating his parental rights.[1]

In case number 07-19-00071-CV we will affirm the order of the trial court terminating the mother's parental rights to D.T. and A.T. and appointing the Department permanent managing conservator of the children. We will reverse and remand for a new trial that portion of the trial court's final order terminating the parental rights of the father to D.T. and A.T. We will affirm the trial court's final order terminating the mother's parental rights to J.C. in case number 07-19-00072-CV.

Background

In May 2017, the Department received a report alleging the mother and the father were using drugs and neglecting the supervision of their children, D.T. and A.T., and the mother's child, J.C. The children's caseworker, Alyssa Petty, testified at final hearing the Department was initially concerned with the father's anger, arguments and domestic violence between the mother and the father, and the family's unsanitary living conditions. Sophia Munoz, a Department investigator, testified the family was homeless.

July 2017 drug screens of the family showed the mother was positive for methamphetamine, amphetamines, and cocaine, the father was positive for methamphetamine and cocaine, J.C. was positive for cocaine, and A.T. was positive for amphetamines and methamphetamine. The Department filed the suits affecting the

---

[1] To protect the privacy of the children, we identify the parents and children in the manner we have. *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2018); TEX. R. APP. P. 9.8(b)(2).

parent-child relationship that month. The children were removed, and the Department was appointed temporary sole managing conservator of each child.

The two cases were tried together to the bench in January 2019. Following the close of evidence, the children's guardian ad litem and attorney ad litem recommended termination of the mother and the father's parental rights to D.T. and A.T. and termination of the mother's parental rights to J.C. He recommended as an alternative appointment of the Department as permanent managing conservator of the three children with the mother and the father named possessory conservators.

In its termination orders in both cases, for each of her three children, the court found the mother had (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child. It further found termination of the mother's parental rights was in the best interest of D.T., A.T., and J.C.[2] The court's final order in case number 07-19-00071-CV also terminated the father's parental rights to D.T. and A.T. on findings that he (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child; and (2) engaged in conduct or knowingly placed the child with persons

---

[2] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D),(E),(O), & (2) (West Supp. 2018).

who engaged in conduct which endangered the physical or emotional well-being of the child and that termination of his parental rights was in the best interest of D.T. and A.T.[3]

**Analysis**

**I. Legal Background**

The Constitution protects "[t]he fundamental liberty interest of natural parents in the care, custody, and management" of their children. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985). Parental rights, however, are not absolute, and courts have recognized it is essential that the emotional and physical interests of a child not be sacrificed merely to preserve the parental rights. *In re C.H.,* 89 S.W.3d 17, 26 (Tex. 2002). The Due Process Clause of the United States Constitution and section 161.001 of the Texas Family Code require application of the heightened standard of clear and convincing evidence in cases involving involuntary termination of parental rights. *In re E.N.C.,* 384 S.W.3d 796, 802 (Tex. 2012); *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002). "Clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re N.G.,* No. 18-0508, 2019 Tex. LEXIS 465, at *7 (Tex. May 17, 2019) (per curiam) (quoting TEX. FAM. CODE ANN. § 101.007).

The Family Code permits a trial court to terminate parental rights if the movant proves by clear and convincing evidence that the parent committed an action prohibited under section 161.001(b)(1) and termination is in the child's best interest. TEX. FAM. CODE

---

[3] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D),(E) & (2) (West Supp. 2018).

ANN. § 161.001(b)(2); *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). Only one predicate finding under section 161.001(b)(1) is necessary to support an order of termination when there is also a finding that termination is in a child's best interest. *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003); *In re T.N.,* 180 S.W.3d 376, 384 (Tex. App.—Amarillo 2005, no pet.). Thus a termination order may be affirmed if it is supported by legally and factually sufficient evidence of any statutory ground on which the trial court relied for termination, and the best interest finding. *In re E.A.G.,* 373 S.W.3d 129, 141 (Tex. App.—San Antonio 2012, pet. denied).

Both the mother and the father challenge the legal and factual sufficiency of the evidence supporting the court's termination orders. Under the legal sufficiency analysis, we examine all of the evidence in the light most favorable to the challenged finding, assuming the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.,* 96 S.W.3d at 266. We disregard all contrary evidence the factfinder could have reasonably disbelieved or found incredible. *Id.* However, we take into account undisputed facts that do not support the finding, so as not to "skew the analysis of whether there is clear and convincing evidence." *Id.* If the record presents credibility issues, we must defer to the factfinder's determinations provided they are not unreasonable. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005).

In a factual sufficiency review, a court of appeals must give due consideration to the evidence the factfinder reasonably could have found to be clear and convincing. *In re C.H.,* 89 S.W.3d at 25. We determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* In doing so we consider whether disputed evidence is such that a

reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *In re J.F.C.,* 96 S.W.3d at 266.

Subsection 161.001(b)(1)(D) permits termination when clear and convincing evidence shows that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Subsection (D) requires a showing that the environment in which the child was placed posed a danger to the child's physical or emotional health, and it permits termination based on a single act or omission by the parent. *In re K.C.F.,* No. 01-13-01078-CV, 2014 Tex. App. LEXIS 6131, at *32-34 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) (citation omitted). Subsection (D) concerns the child's living environment, rather than the parent's conduct, though parental conduct may produce an endangering environment. *Jordan v. Dossey,* 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). It is not necessary that a parent's conduct be directed at the child or that the child be injured, but the parent must at least be aware of the potential for danger to the child in such an environment and must have disregarded that risk. *In re S.M.L.,* 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Illegal drug use and criminal activity support a conclusion that the child's surroundings endanger her physical or emotional well-being. *In re J.T.G.,* 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The relevant time frame under

6

this subsection is prior to the child's removal. *In re O.R.F.,* 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied).

To assess the trial court's best-interest determination, we may consider the factors itemized in *Holley.*[4] While the *Holley* "listing is by no means exhaustive, [it] does indicate a number of considerations which either have been or would appear to be pertinent." *Holley,* 544 S.W.2d at 372.[5] "The absence of evidence about some of these considerations would not preclude a fact-finder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.,* 89 S.W.3d at 27. In some circumstances, evidence of even one *Holley* factor may be sufficient. *Jordan,* 325 S.W.3d at 729 (citing *In re C.H.*, 89 S.W.3d at 27).

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d at 116. But prompt and permanent placement of a child in a safe environment is also presumed to be in the child's best interest. Tᴇx. Fᴀᴍ.

---

[4] The *Holley* factors are: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interests of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley,* 544 S.W.2d at 371-72.

[5] *See In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Family Code section 263.307 ["Factors in Determining Best Interest of Child"] and *Holley* as providing factors for consideration "when determining whether termination of parental rights is in the best interest of the child" and also referencing Family Code section 153.131(b) which provides "a strong presumption that the best interest of a child is served by keeping the child with a parent").

CODE ANN. § 263.307(a). The best interest analysis evaluates the best interest of the child, not that of the parent. *In re A.C.B.,* 198 S.W.3d 294, 298 (Tex. App.—Amarillo 2006, no pet.); *see In re M.G.D.,* 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (noting "the Legislature made clear that courts cannot leave children in foster homes indefinitely while existing parents try to improve themselves and their conditions").

## II. The Department's cases against the mother:

### *In re D.T. & A.T.,* 07-19-00071-CV and *In re J.C.,* 07-19-00072-CV

The mother raises one issue in each of her two appeals. She argues the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the children. She does not challenge the court's findings she subjected the children to endangering conditions and conduct and failed to perform court-ordered requirements for the return of the children.

At the time of final hearing, the evidence showed D.T. and A.T. were in relative placement with a family willing to adopt them. J.C. was moved to a foster home because of behavioral issues. In final hearing testimony, caseworker Petty acknowledged the prospect of placing J.C. with her maternal great aunt. This relative, Petty indicated, was open to adoption.

J.C.'s counselor, Sharon Hensley, testified J.C. was aggressive and defiant, requiring boundaries. After a number of weekly counseling sessions, Hensley stated, J.C. had fewer tantrums and was learning social skills. According to Hensley's testimony,

J.C.'s moods also became more stable after supervised parental visits were stopped in November 2018.

Some testimony indicates the parents' visitation was stopped because D.T. exhibited anger and began bed wetting following the sessions. Because of these behaviors, a counselor, Krystyne Mendoza, saw D.T. on four occasions. She testified that she had not formed an opinion as to the behaviors' cause.

In both cases, the Department prepared a plan of services for the mother to obtain the return of her children. Among other things, the mother was required to maintain a drug-free lifestyle, obtain suitable employment, maintain suitable housing, complete individual counseling, complete co-parenting counseling, complete parenting classes, and participate in an evaluation and case management provided by a local mental health agency. At final hearing, Petty testified the mother did not follow through with the mental health agency, did not finish co-parenting counseling, did not have suitable employment, and did not have stable housing. But the mother had recently obtained employment, working forty hours a week at $15.70 per hour. The mother had not tested positive for any illegal drug since July 2017. Petty agreed in testimony that the mother was homeless. However, Herbert Jones, for whom the mother worked part-time during the case, testified he had a one-bedroom unit available which the mother could rent and occupy within a week. Steven Nelson, a counselor who conducted sessions with both the mother and the father, testified the mother successfully completed six sessions but, in his opinion, whether she could maintain a stable household and stable employment was "yet to be seen."

During the period November 2017 through January 2018 the mother completed six counseling sessions with counselor Delois Hinders. Hinders testified she recommended more sessions but had no further contact with the mother. Among other things, Hinders worked with the mother on relationship issues, supporting a plan of recovery, and parenting issues. In her opinion, the mother did not improve in these areas because of such complicating factors as untreated mental illness and diabetes for which the mother was not receiving treatment. These concerns were echoed by Petty who testified she believed the mother had not successfully mitigated the reasons for the children's removal. She recalled driving the mother for a drug screening following a recent hearing. The mother began "screaming and yelling" to such a degree that Petty had to stop the car until the mother calmed down. Hinders believed the mother should remain in case management to make sure she was medication-compliant and caring for her physical needs. In Hinders' opinion, the mother was not capable of parenting her children and providing a stable home. On cross-examination, Hinders reiterated her opinion the mother's issues were "serious and chronic and persistent," stating "generally . . . people who have the history and trauma [the mother] has" need "weekly intervention for an extended period of time."

According to Petty's testimony, the mental health agency diagnosed the mother with a major depressive disorder. The agency assigned the mother a case manager, Ting Ting Li, to help keep appointments, monitor her medication, and connect with community resources. Li testified the mother began missing appointments after keeping two or three. When the mother could not be reached by telephone and failed to respond to letters, she was terminated as a client of the program.

As for the Department's recommendation, Petty testified that the mother's parental rights to the children should be terminated. On cross-examination, she elaborated that this was based on issues of mental health, housing, and parenting her "overactive" children. The Department apparently intended to seek kinship adoption for the children.

The record of trial demonstrates the Department marshalled a great deal of professional assistance and support for the mother during the almost eighteen-month case. Although she avoided use of illegal drugs, throughout the period she struggled with issues of employment and housing and mental and physical health. By final hearing her housing remained unstable. The record demonstrates a lack of stability in other areas of the mother's life as well. On this record we find the evidence supporting the trial court's best-interest finding, when viewed in the light most favorable to the verdict, legally sufficient. Likewise, when assessed in a neutral light we find the trial court's best-interest finding factually sufficient. In both appeals, the mother's sole issue is overruled.

## III. The Department's case against the father:

### *In re D.T. & A.T.,* 07-19-00071-CV

A. *Subsection (D) predicate finding*

In his first issue the father asserts no evidence or factually insufficient evidence supports the trial court's statutory predicate ground findings under subsections (D) and (E). It is undisputed that at the time of removal the father tested positive for methamphetamine and cocaine, J.C. was positive for cocaine, and A.T. was positive for amphetamines and methamphetamine. Considering all of the evidence in the light most favorable to the trial court's finding and indulging every reasonable inference in favor of

11

that finding, we conclude that the trial court could reasonably have formed a firm belief that the father knowingly placed or knowingly allowed his children to remain in conditions or surroundings which endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Accordingly, the evidence is legally sufficient to support the trial court's finding under subsection (D). Considering the evidence in a neutral light, the evidence of endangering conduct under subsection (D) remains uncontroverted. The factfinder was thus able to form a firm belief that the father violated subsection (D). Because section 161.001(b)(1) requires only one predicate ground finding for termination under section 161.001(b)(1), we do not consider whether sufficient evidence supported the trial court's finding that the father also violated subsection (E). TEX. R. APP. P. 47.1.[6] The father's first issue is overruled.

B. *Best Interest finding*

Through his second issue the father argues no evidence or factually insufficient evidence supports the trial court's finding that termination of his parental rights was in the best interest of D.T. and A.T.

Before removal of his children the father was a user of methamphetamine and cocaine. He had no positive drug screens after their removal. But the court could have

---

[6] Because we will reverse and remand the case after concluding the evidence was factually insufficient to support the best interest finding, consideration of the trial court's subsection (E) predicate ground finding is not necessary. *Cf. In re N.G.,* 2019 Tex. LEXIS 465 (holding when an appellate court intends to affirm the termination of a parent's parental rights and the parent has assigned error on appeal under subsections (D) or (E) due process and due course of law require meaningful review of the parent's complaint under both of these subsections even though the termination order could be affirmed on either predicate ground, or some other predicate ground, and a best-interest finding).

12

considered his prior usage as predictive of what the future holds, particularly a future without the assistance of professional caregivers and mandatory drug screens. *See In re O.N.H.,* 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.) (for the best-interest determination, the court may consider evidence of a parent's past conduct to be predictive of her future conduct). That two of the three children tested positive for the highly addictive drugs adds to the weight of the endangering conduct. The court also heard evidence allowing it to conclude the father's parenting skills are weak. When viewed in the light most favorable to the finding, we find the trial court could have formed a firm belief or conviction that termination of the father's parental rights was in the best interest of D.T. and A.T.

Turning to the father's factual sufficiency challenge, however, we reach a contrary conclusion.

The record contains relatively little information about D.T. and A.T. There was evidence the two were in a kinship placement at the time of final hearing and the placement parents were willing to proceed with adoption. As noted, counselor Mendoza testified she had seen D.T. four times, beginning some two months before final hearing, for aggression and bed wetting. She reported his aggression was "getting better," and she had drawn no conclusions as to its cause. No caregiver testified, and no evidence otherwise addressed the children's physical or emotional condition at the time of final hearing, nor did evidence provide a basis to ascertain the children's desires regarding their relationship with their father.

Hinders also counseled the father but their last session was a year prior to final hearing. She mentioned during testimony that he sometimes fell asleep during sessions but added during cross-examination she was not aware of the reason. She also said the father told her, during a morning session, that he worked until 1:00 a.m. and then had difficulty sleeping. When asked about the father's capability to parent the children Hinders concluded "he would say he would want the children back, but there just didn't seem to be any active engagement on his behalf." Because of the year's lapse between her last session with the father and final hearing, Hinders acknowledged on cross-examination she would defer to the opinions of counselors who had more recently treated the father.

Nelson, the father's counselor, who saw him several months after Hinders, testified the father is a "quiet person." Asked how the father progressed during therapy, Nelson responded, "Satisfactorily. You know, like I say, he's a really quiet person. He's not resistant. He's open to, you know, the input that I had. And he was agreeable but he required prompting. He's a very quiet, reserved individual." Asked if the father's trait of requiring prompting was a cause for concern, Nelson answered, "I think being a very quiet individual doesn't necessarily make you a poor parent . . . I have no reason to believe that he wouldn't be able to supervise his children adequately." He later said he had no reason to believe the father could not be a good parent.

Petty testified, based on her observations at supervised visitation,[7] she was concerned that the father did not take an active role in parenting during the visits. Like Hinders, she said that earlier in the case the father "would often fall asleep and [the

_____

[7] Testimony indicated that CASA began supervising visits at a point in the case. Petty's observations occurred before their move to CASA.

mother] would do the parenting portion with the children." She said the father "was often really tired and would fall asleep in the chair and didn't have a lot of interaction and it was mainly [the mother] getting the kids engaged in activities." Later, without elaboration, she said the father "provided a lot of the financial stability," but she had not "seen him actually parent the kids in watching the visits . . . ." She later said "[i]t's all been [the mother] that's showing the parenting, and he's been providing the financial support." She was also concerned with the father's "back-up plan," to have the mother provide childcare while he worked, should he regain custody of the children. In response to a question by the court, Petty testified that the father told her he could not care for his children without the mother's help. By the time of final hearing, the mother and the father were separated. Another counselor, Stephen Jennings, conducted three co-parenting sessions with them, beginning in December 2018. He testified they "did not want to get back together," had "already made that adjustment and had learned to get along without living together."

Concerning the father's service plan, Petty's testimony indicated he had performed the required services with the exception of the requirement to complete the co-parenting counseling. Petty could not say whether the father had complied with Hinders' recommendation for his evaluation for depressive symptoms, because the father had not signed a release. Unlike the mother, the Department did not allege the father violated subsection (O) by failing to complete his services.

With regard to the plan's requirement that the father maintain a drug-free lifestyle, Petty agreed he had been tested several times during pendency of the case, and had been drug free for "well over a year." The father was also required to maintain stable housing. Petty agreed the father's one-bedroom garage apartment was suitable for him.

15

She thought the apartment was too small and lacked enough furniture for the children. On cross-examination she stated the father told her he would get beds for the children and find a way to "make [his] house work" but had not done so yet. She acknowledged, however, that the Department had not given him a date by which he should have his house ready for the children's presence. Petty agreed the father had maintained stable employment, which the service plan required.

Asked about his concerns about the father, Jennings said his only concern was the size of the father's one-bedroom apartment. He noted also the "drug issues initially." When asked to assume the father had not tested positive for an illegal drug since 2017 Jennings agreed his only concern with the father would be his housing.

Petty testified she did not believe the father "should continue in the children's lives" because "the children need stability of understanding who their parents are going to be and where their home is." She recommended termination of his parental rights and adoption. She also testified, though, "if they're [sic] adoptive home allows contact, that's okay." When asked on cross-examination to support her termination recommendation Petty stated the father had no plan for the children if placed in his care, his housing was not adequate, and she had not seen him parent the children.

The Department argues the court's subsection (D) and (E) findings of endangering conditions and conduct support its best-interest finding. We agree that findings a parent has endangered a child through conditions or conduct support a conclusion termination is in the child's best interest. *See, e.g., In re C.A.,* Nos. 07-18-00439-CV, 07-18-00440-CV, 2019 Tex. App. LEXIS 4781, at *9 (Tex. App.—Amarillo June 6, 2019, no pet. h.)

16

(mem. op.) (so holding, citing *In re C.H.,* 89 S.W.3d at 28). We do not minimize the significance of the undisputed evidence the father and the mother tested positive for methamphetamine and cocaine at the time of the children's removal, nor the significance of the reasonable inference the parents were responsible for A.T.'s positive test for amphetamines and methamphetamine. The Department also emphasizes holdings that "past is often prologue," arguing that the father's past drug use suggests his continuing parental relationship with his children presents an emotional and physical danger to the children, now and in the future. *Holley,* 544 S.W.2d at 371-72. We have so held in other cases. *See, e.g., In re A.M.,* Nos. 07-18-00047-CV, 07-18-00048-CV, 2018 Tex. App. LEXIS 3688, at *7 (Tex. App.—Amarillo May 23, 2018, pet. denied) (per curiam, mem. op.).

The strength of the inference that the father's past presages his future is substantially reduced in this case, however, by the undisputed evidence he had been drug-free for more than a year by the final hearing. Petty's testimony indicated that, between early December 2017 and final hearing in January 2019, the father was drug tested ten times and on each occasion the result was negative for illegal drugs. None of the Department's witnesses expressed concern over a possible relapse into drug use.

The Department emphasizes also the undisputed evidence the court suspended the parents' supervised visits in November 2018, some two months before the final hearing. As the Department sees it, the suspension speaks strongly to the father's inability to meet his children's emotional needs. Naturally, the trial court would have been aware of its reasons for suspending visitation two months before, but the evidence before us on that subject is thin. Petty testified visitation was suspended because D.T. had

17

"behavior issues after visitation, some confusion about what was going on in the case, why he was not staying with mom, and was acting out angrily afterwards and also wetting the bed afterwards." Jennings testified he learned from the father and the mother that the Department stopped visitation because of the children's anxiety.

The Department relies also on the testimony that the father fell asleep during early supervised visits and during his counseling appointments with Hinders, which were completed by January 2018. She testified the father was "very difficult to engage in therapy because he was constantly falling asleep during the therapy time, and I was having to constantly rouse him and awaken him." She expressed concern that the father seemed apathetic "towards the whole situation." Petty gave similar testimony of visits she observed during an early stage of the case. Nelson, however, did not complain of the father's sleepiness during sessions or that the father was otherwise distracted. As noted, he testified the father was receptive to his help. Jennings likewise made no complaint of the father's attentiveness during counseling sessions. Notably, Nelson and then Jennings counseled the father several months after the completion of Hinders' therapy and Petty's observation of family visitation.

The Department infers from the father's behavior during that time an unwillingness to take advantage of assistance offered him and a further indication of his inability to meet the emotional needs of the children. In connection with that evidence, the Department points to testimony regarding a recommendation Hinders made for the father's evaluation for "depressive symptoms," which, along with other recommendations she made, apparently was included in an August 2018 family service plan evaluation. Petty testified she did not know if the father had been evaluated for depressive symptoms because he

had not signed a release authorizing disclosure of any records to the Department. From that testimony, the Department infers the father failed to obtain the assessment, and argues this failure reinforces his unwillingness or inability to provide his children the care needed now or in the future.

Similarly, the Department's brief repeatedly emphasizes the parents' failure to complete co-parenting counseling by the final hearing. Testimony indicated the requirement was added to the service plan during August 2018, after Hinders recommended it. The Department argues the father's failure to complete the counseling by the final hearing date again shows his unwillingness to participate in programs to improve his parenting skills. But the testimony at the final hearing leaves it far from clear that either parent was to blame for the late beginning of the co-parenting counseling they received from Jennings. Co-parenting was to begin after the mother completed individual therapy in November. Why the sessions with Jennings began so late in the case is not established by the record. The Department presented no evidence, moreover, showing that the father and the mother were slow to respond to its referral for co-parenting counseling with Jennings.

Jennings testified his three sessions with the mother and the father went well and they were receptive to his suggestions. He recommended the mother and the father complete three more sessions to conclude a six-session counseling regimen. He added they should thereafter "probably" complete six additional sessions. As noted, after learning the father had been drug free since 2017 Jennings testified his only concern with the father as a parent was his apartment's lack of size.

The case was initiated because of the family's homelessness and the mother and the father's drug use and allegations of violence. Over the course of the eighteen-month case, undisputed evidence showed the father addressed each of those issues. He had stable housing and employment; had been drug-free for over a year; and had separated from the mother. The Department sees in the suspension of visitation, the caseworker's lack of a release for records of a depression evaluation, and the late start to co-parenting counseling evidence that termination is in the children's best interest, but we cannot agree the record supports a view of those events as having significant bearing on the issue. According to the co-parenting counselor, the mother and the father had adjusted to separation and "learned to get along without living together." As noted, no witness expressed any present concern the father was likely to relapse into drug use. The father's counselor saw no reason he could not be a good parent and supervise his children adequately. The caseworker, despite her expression of regard for the professionals to whom the Department referred the father, demeaned the father's parenting skills with little substantive elaboration. She expressed "concerns" over the father's one-bedroom apartment despite her apparent agreement he could afford larger quarters, and over his statement, made at some point during the case, that he planned to have the mother help him with their children when he was at work.

The children's attorney ad litem and guardian ad litem, and the CASA volunteer, found the cases "difficult" and "a hard one." Having carefully reviewed the entire evidentiary record in a neutral light, we find the trial court could not reasonably have seen it as clearly and convincingly demonstrating the truth of the Department's allegation regarding best interest. Said another way, we find the evidence which does not support

20

the court's best-interest finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of the father's parental rights was in the best interest of D.T. and A.T. *In re J.F.C.,* 96 S.W.3d at 266; *In re A.B.,* 437 S.W.3d 498, 506 n.8 (Tex. 2014).

C. *Conservatorship*

By his third issue, the father argues the evidence was legally and factually insufficient to support the trial court's order appointing the Department sole managing conservator of D.T. and A.T.

Appointment of a non-parent as sole managing conservator is a question distinct from termination of parental rights as it concerns different elements, different standards of proof, and different standards of review. *In re J.I.T.,* No. 01-17-00988-CV, 2018 Tex. App. LEXIS 4728, at *69 (Tex. App.—Houston [1st Dist.] June 27, 2018, pet. denied) (mem. op.). The Family Code establishes a rebuttable presumption that it is in a child's best interest for his parents to be named his joint managing conservators. Tex. Fam. Code Ann. § 153.131(b) (West 2014). The presumption is rebutted by a finding that appointment of a parent would "significantly impair the child's physical health or emotional development." Tex. Fam. Code Ann. § 153.131(a); *In re J.A.J.,* 243 S.W.3d 611, 616 (Tex. 2007). When making the conservatorship determination the best interest of the child remains the court's chief concern. *In re J.I.T.,* 2018 Tex. App. LEXIS 4728, at *69 (citing Tex. Fam. Code Ann. § 153.002). The court considers the *Holley* factors as well as those of Family Code section 263.307 for its conservatorship decision. *Id.* The degree of proof required for the conservatorship determination is a preponderance. *In re J.I.T.,* 2018 Tex.

21

App. LEXIS 4728, at *70; TEX. FAM. CODE ANN. § 105.005 (West 2019). And the standard of review is abuse of discretion. *In re J.I.T.,* 2018 Tex. App. LEXIS 4728, at *70. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, or without reference to guiding principles of law. *In re H.E.B.,* No. 07-17-00351-CV, 2018 Tex. App. LEXIS 885, at *12 (Tex. App.—Amarillo Jan. 31, 2018) (mem. op.) (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985)). Generally, under the abuse of discretion standard applied in family law cases, legal and factual sufficiency of the evidence are not independent grounds of error but are relevant factors for determining whether the trial court abused its discretion. *In re E.R.S.,* No. 07-17-00255-CV, 2018 Tex. App. LEXIS 3762, at *4 (Tex. App.—Amarillo May 24, 2018) (mem. op.) (citing *In re B.F.,* No. 07-16-00282-CV, 2017 Tex. App. LEXIS 2712, at *9 (Tex. App.—Amarillo Mar. 29, 2017, no pet.) (mem. op.)). In light of the standard of proof required and the standard of review, a trial court may not abuse its discretion by appointing the Department sole managing conservator even though the evidence supporting termination of parental rights is factually insufficient under the clear and convincing standard. *In re R.W.,* No. 01-11-00023-CV, 2011 Tex. App. LEXIS 4556, at *35, *37-40 (Tex. App.—Houston [1st Dist.] June 16, 2011, no pet.) (mem. op.).

Under the standard of review applicable to this issue, in light of the evidence regarding the father's work schedule and his present living quarters, and in light of the trial court's rulings regarding the mother, we find the court did not act in an arbitrary or capricious manner in determining the appointment of the father as sole permanent managing conservator would not be in the children's best interest. We overrule the father's third issue.

Conclusion

In case number 07-19-00071-CV we affirm the portions of the final order terminating the mother's parental rights to D.T. and A.T. and appointing the Department permanent managing conservator of the children. TEX. R. APP. P. 43.2(a). We reverse and remand for further proceedings the portion of the final order terminating the parental rights of the father to D.T. and A.T. TEX. R. APP. P. 43.2(d). Any retrial of the Department's case against the father must commence no later than 180 days after this court's mandate issues. TEX. R. APP. P. 28.4(c). In case number 07-19-00072-CV, we affirm the trial court's final order terminating the mother's parental rights to J.C. TEX. R. APP. P. 43.2(a).

James T. Campbell
Justice